COMMISSIONER OF INTERNAL REVENUE, Respondent; MONTGOMERY INVESTMENT COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Montgomery v. Commissioner
Docket Nos. 2094-75; 2095-75.
United States Tax Court
T.C. Memo 1989-295; 1989 Tax Ct. Memo LEXIS 307; 57 T.C.M. (CCH) 726; T.C.M. (RIA) 89295; June 19, 1989. Urban C. Bergbauer, for the petitioners. Gary F. Walker and Robert B. Nadler, for the respondent. PARKER MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: *308 In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax and additions to the tax under section 6651(a) [1] as follows: Additions to Tax
Docket No.
Petitioners
Years
Deficiencies
Section 6651(a)
2094-75
Joel and Mary Lou
1966
$ 147,017.18
$  7,550.09
Montgomery
1967
161,585.06
15,656.63
1969
17,554.68
2095-75
Montgomery Invest-
FYE 09/30/66
$  25,183.22
Investment Co.
FYE 09/30/67
143,376.39
FYE 09/30/68
52,939.42
FYE 09/30/69
173,635.36
The deficiencies arise principally from a determination by respondent that the Montgomery Investment Company is the proper taxpayer, not Joel A. Montgomery, as to certain gains on the sales of real property in Stoddard County, Missouri and Fulton County, Georgia in its fiscal years ending September 30, 1966 and September 30, 1969, respectively, and as to the so-called Brazos *309 investment for its fiscal year ending September 30, 1967. After concessions, [2] the issues to be decided are: (1) Whether the owner, for tax purposes, of the Stoddard Farm property located in Missouri was Joel A. Montgomery or Montgomery Investment Company; (2) Whether the owner, for tax purposes, of the Fulton County property located in Georgia was Joel A. Montgomery or Montgomery Investment Company; (3) Whether the owner of an asset account captioned "Investment-Brazos Engineering Company" was Joel A. Montgomery or Montgomery Investment Company, and whether Joel A. Montgomery received dividend income and a return of capital in the form of a promissory note and certain Brazilian real estate in 1967; and (4) Whether the Montgomerys' failure timely to file their 1966 and 1967 Federal individual income tax returns was due to reasonable cause and not due to willful neglect. *310 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The individual petitioners are Joel A. Montgomery ("Montgomery") and Mary Lou Montgomery, now deceased, husband and wife, who at the time their petition was filed resided in Sikeston, Missouri. In addition, the corporate petitioner is the Montgomery Investment Company ("MIC"), which at the time the petition was filed maintained its legal address in Sikeston, Missouri. MIC files its corporate income tax returns based on a fiscal year ending September 30. The returns of all petitioners for the periods involved herein were filed with the Internal Revenue Service at St. Louis, Missouri. GENERAL BACKGROUND
Montgomery went to law school but has always worked in the real estate business rather than practicing law. On a regular basis Montgomery would organize corporations, have the corporations purchase real estate, sell the real estate and then collapse the corporations to receive capital gains treatment on the proceeds from the real estate. [3] On October 2, 1961 MIC was incorporated in the State of Missouri. *311 Montgomery incorporated MIC at the suggestion of his accountant, who recommended that he hold his investments in a corporation. Montgomery was the president and the majority shareholder of MIC, owning 498 shares out of 500 total shares of issued stock. Mary Lou Montgomery owned one share of stock and Cecil Montgomery owned one share of stock. The Articles of Incorporation of MIC stated that it was organized for the following purposes: (a) The general nature of its business shall be to buy, sell, and otherwise deal in notes, stocks, bonds, or other investments, including the right to hold, buy, sell, lease, mortgage, or otherwise incumber, sell, and dispose of real and personal property of all kinds and descriptions. (b) The general nature of its business shall be, for itself or as agent or correspondent for others, to deal in stocks, bonds, commercial paper, mortgages, and other securities, to *312 manage estates and properties, and to conduct a general insurance agency and a general real estate and rental business, including the buying, selling, leasing, improving, and dealing in lands and tenements, and the construction and selling of houses and buildings. * * * * * * (e) To the same extent as natural persons might or could do, to purchase or otherwise acquire, and to hold, own, maintain, work, develop, sell, lease, exchange, hire, convey, mortgage, or otherwise dispose of and deal in, lands and leaseholds, and any interest, estate, and rights in real property, and any personal or mixed property, and any franchises, rights, licenses, or privileges necessary, convenient, or appropriate for any of the purposes herein expressed. * * * (h) To conduct the business of this corporation and such purposes to have one or more branch offices or places of business and unlimitedly and without restriction, except as hereinbefore stated; to hold, purchase, lease, mortgage and convey real and personal property in or out of this state, and in such place or places in the several states and territories or acquisitions of the United States, as shall from time to time be found necessary. *313 At the first meeting of the board of directors of MIC on October 23, 1961, Montgomery was elected president, Cecil Montgomery was elected vice-president, and Mary Lou Montgomery was elected secretary and treasurer. At the May 20, 1962 board of directors meeting of MIC, a resolution was passed giving the president, Montgomery, the power for and on behalf of MIC "to enter into and execute contracts, leases, notes, negotiable instruments of each and every kind, and any other form of agreement with any person or persons, corporation, partnership, or any officers of any City, County, State or Federal Government." On April 6, 1964, Montgomery resigned as president and became chairman of the board of directors. Eugene E. Redfern was then elected as president of MIC. Mr. Redfern was then given the authority, as Montgomery had previously had the authority, to negotiate and execute contracts, lease agreements, rate schedules, notes, deeds, deeds of trust, and loan commitments. By January 9, 1965, Montgomery was again serving as the president of MIC and was officially "reinstated" as president of MIC on January 2, 1967. On January 2, 1967, MIC and Montgomery entered into an agency agreement. *314 In the agreement MIC is referred to as a corporation "engaged in the business of buying, selling, trading, exchanging and developing and operating various property, real, personal and mixed, and business * * *." The agreement states: WHEREAS, Joel A. Montgomery has heretofore been active as an agent and attorney-in-fact for said Company, in which capacity he has been actively engaged in business transactions for and on behalf of the said company; and WHEREAS, the parties hereto desire to have reduced to writing the power, authority and duties of the said agent and attorney-in-fact with reference to the discharge of said duties with and on behalf of the said Company. NOW THEREFORE, It is stipulated and agreed that the said Joel A. Montgomery is designated as an agent and attorney-in-fact for and on behalf of said Company, and, as such, he is authorized, subject to the conditions hereinafter set out: 1. To act on behalf of the Company in the pursuit of the business purposes for which said Company is authorized to have or participate in. 2. To buy, sell, trade, exchange, develop and/or operate various businesses for and on behalf of said Company. * * *
4. To incur indebtedness *315 for and on behalf of said Company and in his own name and/or on behalf of the said Company, for the purpose of carrying out or for the promotion of the business purposes for which the Company exists. 5. To have property purchased or otherwise acquire in the name of the Company or in his own name and to deal with said property, if taken in his own name, in the manner and to the extent the Company is and would be authorized to deal with said property. 6. To disclose or not to disclose to third parties the agency or the relationship of the said agent to and with the said Company. 8. To transfer, convey or deliver on request or demand, such properties or assets, real, personal and mixed, as may come into his hands or possession, actual or constructive, or subject to his control in the course of his activities on behalf of the company. 9. That such properties and assets shall be held by him as Trustee for the said Company, and his relationship with the said Company shall be that of a Fiduciary with reference to properties and activities engaged in on behalf of said Company. * * * 13. The Company hereby and herewith ratifies and confirms all duties performed and actions *316 taken by the agent for and on behalf of the Company and such future actions as may be performed by the said agent on behalf of the said Company. The last minutes of MIC entered into evidence were minutes from a meeting of the directors and shareholders held on November 14, 1974. The record does not indicate that the above quoted agency agreement was ever terminated at any time pertinent to this case. THE STODDARD FARM
By warranty deed dated as of August 29, 1961, Montgomery purchased from R.D. Clayton a farm, called the Stoddard Farm, containing approximately 1,039.61 acres. The land was transferred to Montgomery subject to a mortgage on the property from Connecticut General Life Insurance Co. The transaction was to close on or before January 1, 1962 when Montgomery was to pay Mr. Clayton the balance of the purchase price of $ 130,000. On January 1, 1962, various loan receivables, investments in securities, real estate and other assets were transferred by Montgomery to MIC. In exchange for the transfer of these assets, MIC agreed to assume certain liabilities whose repayment was secured by some or all of the assets transferred, and the sum of $ 886,978.41 was credited *317 by MIC to an account in the name of Joel Montgomery and treated as an account payable due from MIC to Montgomery to be repaid on demand. A credit for these assets in the total amount of $ 1,074,798.56 was entered on MIC's general journal to an account entitled "Joel A. Montgomery, Personal." Included among the assets Montgomery transferred to MIC was the Stoddard Farm with a basis of $ 13,000. The explanation in MIC's books for the credit to the "Joel A. Montgomery, Personal" account was To credit Joel A. Montgomery with assets placed in corporation on 1/1/62 subject to liabilities per Minutes of Board of Directors meeting held on 1/1/62. The corporate minutes of the meeting held on January 1, 1962 could not be located and are not among the corporate minutes produced and received into evidence. [4]
A warranty deed for the Stoddard Farm was recorded on January 25, 1962 in *318 the names of Joel A. and Mary Lou Montgomery. The transfer of Stoddard Farm from Montgomery to MIC appeared on the books of MIC, but no warranty deed ever reflected this transfer. In other words, the Montgomerys at all times held legal title to the 1,039.61 acres. On February 13, 1962, Montgomery purchased 42 acres of land from M. J. and Hattie Louise Bombolaski, which became part of the Stoddard Farm. MIC's general ledger reflected this as "Investment - Bombolaski Farm - 42 acres Dexter, Mo." By warranty deed dated April 2, 1963, MIC purchased land containing approximately 389.44 acres from J. H. and Zelma Craig. A general warranty deed reflecting that transfer was filed on April 4, 1963. A deed of trust by a corporation was filed in which MIC was stated to own the property. That deed of trust document was signed "Montgomery Investment Company/By Joel A. Montgomery/President." On February 8, 1964, a Warranty Deed by Corporation was executed, stating that MIC was transferring the above 389.44 acres to Montgomery. The deed to the 389.44 acres was recorded on February 10, 1964. [5]
*319 Although acquired separately, the above three parcels of land located in Missouri (the Stoddard Farm, the Bombolaski Farm in Dexter, and the Craig acreage) comprise a 1,472-acre farm variously identified in the books and records of MIC as the "The Stoddard Farm," the "The A. T. Earls Farm," or the "Dexter Farm." Hereinafter, this 1,472-acre farm will be referred to as the Stoddard Farm. The Stoddard Farm had a total adjusted basis of $ 267,286.60. The Stoddard Farm was rented out to sharecroppers. MIC's Federal corporate tax returns for its fiscal years from 1963 through 1965 reflect the Stoddard Farm (under the name "Earls Farm") as a corporate asset under the title "Real Estate." MIC reported all of the rental income and expenses for the Stoddard Farm on its Federal corporate tax returns. MIC also claimed deductions for depreciation on certain improvements to the Stoddard Farm. From January 1, 1962 until August 9, 1966, MIC also consistently recorded expenses of the farm, including maintenance expenses, and development and building improvements of the farm on its corporate books. MIC also reflected on its corporate ledger farm rental income from the Stoddard Farm for the *320 years 1964 to 1966. The mortgages to which the Stoddard Farm was subject for the purchase price were also transferred to and recorded on MIC's corporate books. MIC repaid those loans for which the Stoddard Farm was used as collateral. For all the years in question, Montgomery's personal account books had reflected under cash receipts numerous cash advances to Montgomery from MIC. On September 30, 1966, MIC's corporate books stated that the sale of the Stoddard Farm was reported on Montgomery's 1966 tax return. [6]
On June 15, 1965, an unsigned warranty deed had purported to convey all 1,472 acres of the Stoddard Farm from Montgomery to Aubrey Lee Michael, Jewell Marie Michael, John Dennis, and Myrtle Dennis. On that same day Montgomery and his wife executed general warranty deeds and trust deeds conveying other property to both the Michaels and the Dennises in which both Montgomery and his wife signed the deeds. *321 There is no explanation in the record as to what these various trust deeds, indentures, and general warranty deeds cover. [7]
On September 12, 1966, a "Contract and Agreement" was executed between *322 Montgomery and Aubrey Michael for the sale of all 1,472 acres of the Stoddard Farm. The Contract and Agreement also specified that "First Party [Montgomery] shall pay all taxes and special assessments for the year 1966" and that "Second Party [Michaels] shall have complete possession of the Stoddard County lands on January 1, 1967." Mr. Michael agreed to pay $ 662,400 for the property ($ 657,800 for the farm and $ 4,600 for the farm equipment). This price included Mr. Michael's assumption of the first mortgage from Connecticut General Life Insurance Co. in the amount of $ 220,800, cash in the amount of $ 140,200, and a second mortgage in the amount of $ 301,400. MIC deposited the $ 140,200 cash received from Mr. Michael into its corporate bank account and recorded it in its cash receipts journal. All of the cash proceeds received from the sale of the Stoddard Farm were used by MIC to pay expenses associated with the sale of the farm and to pay off the obligations and loans owed by MIC or incurred for its benefit. None of those cash proceeds were used for the personal benefit of Montgomery or distributed to him personally. Montgomery reported the gain from the sale of the *323 Stoddard Farm as capital gain on his Federal income tax return for the 1966 taxable year. He reported the sale as occurring on September 12, 1966. However, he reported the sales price as $ 441,600, omitting entirely the $ 220,800 first mortgage assumed by the purchaser. No mention of the sale was made on MIC's corporate tax returns for either its 1966 or 1967 fiscal year. On January 12, 1967, Mr. and Mrs. Michael executed a deed of trust together with a promissory note as a second mortgage on the Stoddard Farm, promising to pay Mr. and Mrs. Montgomery the sum of $ 301,400. On October 4, 1967, the Michaels agreed to make an exchange of the $ 301,400 second mortgage note for $ 125,000 in cash and a $ 160,000 note that Montgomery owed to the Michaels on a 13-acre tract referred to as the old drive-in theater property. [8] Montgomery subsequently sold the 13 acres for $ 75,000. MIC ultimately received both the $ 120,000 in cash and all but about $ 19,000 of the $ 75,000 proceeds from the sale of the 13 acres. Consequently, Montgomery did not personally benefit from any of the proceeds of the sale of the Stoddard Farm, except possibly for some $ 19,000 of the $ 75,000 which he received *324 in a later year not before the Court. THE FULTON COUNTY PROPERTY
By a deed dated April 3, 1961, the Dixie Land & Timber Corp. sold Montgomery a 75-acre tract of land in Fulton County, Georgia (hereinafter referred to as the Fulton County property). The Dixie Land and Timber Corp. transferred this property to Montgomery in exchange for a $ 240,000 second deed of trust held by Montgomery on 28,000 acres of land in Crossville County, Tennessee owned by Dixie Land and Timber. On April 17, 1961, the Guaranty Title Insurance Co. insured Montgomery *325 not exceeding $ 110,000 against any defect in his title to the Fulton County property. The Fulton County property tract, with a basis of $ 1,127, was transferred by Montgomery to MIC at the time that the Stoddard Farm was transferred to MIC, i.e., on January 1, 1962. As with the Stoddard Farm, MIC's Federal corporate tax returns for its fiscal years 1963 through 1969 included the Fulton County land as a corporate asset under the title "Real Estate." The corporate return for fiscal year 1969 reflected some type of disposition of the property that year, but reported no gain or loss on the transaction. MIC consistently took real estate tax deductions pertaining to the Fulton County land on its Federal income tax returns from 1962 through 1969. During the period from January 1, 1962 through the date the Fulton County tract was sold on February 12, 1969, all of the expenses were paid by MIC, and all of the mortgage payments on the land were made by MIC. MIC's ledgers debited MIC's accounts for real estate taxes paid on the Fulton County property. In addition, MIC reflected on its corporate books receipts of income, loan proceeds, the payment of expenses, the repayment of loans as *326 to which the Fulton County land was used as collateral, and the proceeds from the sale of the land. On May 20, 1965 the Fulton Superior Court ordered a small part of the Fulton County land condemned for the immediate possession by the State Highway Department of Georgia. By a deed described as a Sanitary Sewer Easement dated August 30, 1965, Montgomery purported to make a conveyance to the City of Atlanta, Georgia of certain rights and easements on the Fulton County land. However, the income from this condemnation and conveyance was reported on MIC's corporate tax return for its fiscal year ending September 30, 1965. On July 29, 1968, Montgomery granted the City of Atlanta an option to purchase the Fulton County land. On February 12, 1969, the City of Atlanta purchased the Fulton County land from Montgomery. At that time Montgomery signed an affidavit to the City of Atlanta, affirming that he owned the Fulton County property. The City of Atlanta paid $ 423,040 to Montgomery for the Fulton County property. Since the basis in the Fulton County property was by then $ 53,760.50, the gain from the sale was $ 369,279.50. The proceeds from the sale of the Fulton County land were *327 used by MIC to pay for expenses related to the sale or to pay back loans incurred by MIC or for its benefit. MIC's corporate books reflected the sale of the Fulton County property on February 12, 1969 to the City of Atlanta for $ 423,040. MIC also reflected and deducted the costs of the sale of the property in its corporate books. MIC's cash receipts journal indicates that on February 13, 1969, MIC received a cash payment of $ 147,786.84 from the account receivable owed by the City of Atlanta for the sale of the Fulton County property. MIC deposited the payment on February 13, 1969 into its bank account. Upon the receipt of that money, MIC decreased its $ 423,040 account receivable from the City of Atlanta by $ 147,786.84. As to the balance of $ 275,253.16, MIC's corporate books show that $ 83,333.33 was used to pay off the first mortgage on that property, an additional $ 44,132.99 was used for various expenses, and the balance of $ 147,786.84 was distributed to Montgomery, who used the amount to pay a bank note he owed. Montgomery reported the entire $ 369,279.50 gain from the sale of the Fulton County property as capital gain on his Federal income tax return for the 1969 taxable *328 year. MIC did not report any part of that gain on its corporate return for its fiscal year 1969, although its listing of its real estate investments on that return showed an ending balance of zero for that property. MIC/MONTGOMERY CUSTOMARY PRACTICE
During the period from 1962 through 1969, Joel A. and Mary Lou Montgomery were identified in separate warranty deeds as the owners of numerous parcels of real estate that were also listed on the books of MIC as corporate assets. a. Jackson County Farm
These properties included property in Jackson County, which Montgomery purportedly purchased along with his wife on June 2, 1965. This property was described on MIC's books as "Investment - Jacobs, Illinois - Jackson County Farm." The entry in MIC's corporate books stated that money was allocated from MIC to Montgomery "for funds used to purchase the Jackson Co. Farm." The sale of the Jackson County farm on December 16, 1966 was also recorded in MIC's corporate books and the gain reported on MIC's corporate tax return, albeit erroneously reported for the fiscal year 1966 rather than 1967. b. Maxwell Farm
Joel A. and Mary Lou Montgomery were again identified as the *329 purchasers in a warranty deed dated December 31, 1964. This was the property referred to on MIC's ledgers thereafter as the asset "Investment - Maxwell Farm." MIC recorded expenses from the Maxwell farm on its general ledger, and the sale of part of the land was also recorded on MIC's ledger books. However, in the warranty deed dated November 22, 1967, Mr. and Mrs. Montgomery alone purported to transfer the deed when the land was sold. The gain from that sale was reported on MIC's corporate return for its fiscal year ending September 30, 1968. c. Castel Farm
Additionally, Montgomery and his wife purportedly purchased property in Wayne County, Illinois on January 29, 1962. This property was thereafter described as an asset on the books of MIC under the title "Investment - Castel Farm - Wayne Co., Fairfield, Ill." MIC also recorded the income from that farm on its corporate ledgers. The Castle Farm was sold on December 22, 1965, and the gain was reported on MIC's corporate return for its fiscal year 1966. d. J. R. Lee Farm
Joel A. and Mary Lou Montgomery were also identified as the owners in three warranty deeds dated October 2, 1959, October 23, 1959, and June 27, 1962, relating *330 to the acquisition and later sale of a certain 730-acre tract of land located in Scott County, Missouri. This farm was referred to as the "J. R. Lee Farm" on MIC's ledger and was shown as an asset of MIC. The sale of the farm was also noted on MIC's ledger. The Lee Farm was sold on December 28, 1962, and the gain from the sale was reported on MIC's corporate return for its fiscal year 1963. With regard to all of the property listed above, MIC was apparently never listed as the owner on any of the deeds. The corporate records of MIC and the personal records of Montgomery disclose the following consistent practice. Montgomery customarily purchased and retained legal title to real estate in his name or in the names of his wife and himself. However, such properties were customarily reflected on MIC's corporate records and corporate tax returns as assets of MIC. Moreover, the income and expenses of such properties were customarily reflected on MIC's corporate records and reported on its corporate tax returns. Finally, except for the two properties involved in this case, MIC customarily reported on its corporate returns the gain from the sale of such real estate. THE BRAZOS *331 INVESTMENT
Prior to 1962 loans were made to Paul E. McDaniel, president of Brazos Engineering Co. As of January 1, 1962, those loans amounted to $ 123,000. This loan receivable was one of the assets transferred by Montgomery to MIC on January 1, 1962. From January 1, 1962 to December 31, 1967, further loans or investments were made. These amounts appeared on MIC's corporate ledgers with the notation "Loan receivable - Paul E. McDaniel, Houston, Texas," or "Investment-Brazos Engineering Co." The parties disagree as to whether these further amounts were loans or investments and whether they were made by MIC or by Montgomery in his individual capacity. The loan receivable entries on MIC's corporate books date from January 1, 1962 through December 31, 1967. The first entry is a debit for $ 123,000. There follow a series of further loans (debits) and payments on such loans (credits). The last entry for December 31, 1967 shows a credit to Montgomery of $ 316,978.92 and a zero balance on MIC's "Loan receivable-Paul E. McDaniel, Houston, Texas" account. In addition to the loan receivable account, there also appeared on MIC's general ledgers an account entitled "Investment-Brazos *332 Engineering Co." That account dates from October 17, 1966 through December 31, 1967 and the final entry thereon is a credit to Montgomery in the amount of $ 145,941.63, leaving a zero balance for MIC's Brazos investment account. The total amount advanced with respect to Brazos, either as loans or investments, by MIC and/or Montgomery was $ 585,199.55. This total amount included the transfer on MIC's corporate ledgers and certain other transfers that appeared on Montgomery's personal books. In February of 1966 Montgomery entered into an agreement with other investors of Brazos Engineering Co. These other investors, Howard L. Terry and Walter M. Mischer of Texas and Samuel Pearlman, Jordan M. Friedman, and Lancet, Inc. of Massachusetts, entered into an agreement for the purpose of acquiring the claims of certain prior secured creditors of Brazos whose anticipated foreclosures threatened to wipe out the inferior claims of Montgomery and these Texas and Massachusetts investors. This agreement was terminated on March 2, 1967. [9]
*333 On March 2, 1967, Montgomery entered into an agreement with Howard L. Terry in which Montgomery agreed to assign all of his rights and claims against Brazos Engineering Co. stock to Mr. Terry and Mr. Mischer in exchange for a promissory note of $ 300,000 guaranteed personally by Mr. Terry and Mr. Mischer. Montgomery retained after this agreement [10] a one-half interest in 45,310 acres of land located in the Mato Grasso area of Brazil and he remained liable on a note for $ 1,250,000 to Farm and Home Savings Association. In addition, on March 2, 1967 Brazos Engineering Co., together with MIC and Montgomery, released and discharged each other from any claims, debts, or actions between Brazos and either MIC or Montgomery. Both MIC and Montgomery executed the release document since the document specified "there being some question insofar as Brazos is concerned as to whether certain funds advanced by Montgomery were in behalf of the Investment Company or in his own behalf * * *." The document went on to state: "according to the books and records of Montgomery Investment Company there was due and owing that company on account of secured and unsecured loans made to Brazos as of February 15, 1966, the *334 total sum of $ 490,000.00 * * *." No mention was made of any amount owed to Montgomery personally. Various entries appear on MIC's corporate books on December 31, 1967, that purport to characterize or recharacterize earlier transactions in regard to Brazos. On December 31, 1967, "Investment-Brazos Engineering Co." appeared as an asset account on MIC's financial statements. This account consisted of $ 316,978.92, with the notation "Funds to Brazos Engineering Co. as of 10/7/63." In addition, the account itemized various debits to the Brazos Engineering Co. investment account totaling $ 268,220.63, which together with the $ 316,978.92 amounted to a balance of $ 585,199.55. On that same account the last entry was a credit in the amount of $ 585,199.55, the total amount invested in and/or loaned to Brazos Engineering Co.
On December 31, 1967, Montgomery for the first time listed the Brazos Engineering Co. as an asset on his personal books. The first entry is for the promissory note guaranteed *335 by Mr. Terry and Mr. Mischer in the amount of $ 300,000. The notation with this receivable stated that it was "to record note received on sale of investments Brazos Engineering Co. on 3/2-67." On December 31, 1967, Montgomery's personal books established an account with three journal entries totaling $ 585,199.55. The first journal entry in Montgomery's personal journal debited and then credited Montgomery's account in the amount of $ 316,978.92. The notation after this transaction stated: "To record funds to Brazos Engineering Co. by JAM Personally Disbursed by Montgomery Inv. Co. as of 10/7-63." A second journal entry increased the Brazos asset account by the amount of $ 246,980.74, which contained most of the items in the $ 268,220.63 entry on MIC's books, discussed above. The journal's explanation was "To record acquisition of Brazos Engineering Co. as of 10/7-63." A third journal entry increased the Brazos asset account by an additional $ 21,239.89, which picked up the other items in the $ 268,220.63 entry on MIC's books. The Montgomery journal entry explanation stated: "To record funds disbursed by Montgomery Investment Co. for Brazos Engineering liability of Joel Montgomery *336 * * *." Some of the same entries earlier listed as part of the $ 246,980.74 are again debited and credited (a wash) with the explanation "to record payments on Brazos notes by Montgomery Investment Co. for J. Montgomery Personally." The last entry on Montgomery's personal journals was a debit entered against the Brazos account for $ 585,199.55, and a credit entered with the notation "To transfer to cost of sales the cost of Brazos Engineering Company." On May 14, 1968, a letter setting out a schedule of the loss on the Brazos Engineering Co. stock was sent to MIC by its accounting firm. This letter stated that the total Brazos Engineering Company stock costs, according to a schedule of payments to Brazos, totaled $ 585,199.55. The total of $ 585,199.55 included a loan to McDaniel of $ 316,978.92, advances to Brazos of $ 246,980.74, plus attorneys' fees of $ 2,357.76, and net interest expense of $ 18,882.13. The $ 300,000 note received on March 2, 1967 was then subtracted from the total stock costs, so that the loss on the stock was shown as $ 285,199.55. On his 1967 individual tax return, Montgomery deducted a capital loss of $ 285,199.55. The return stated he acquired the asset *337 on October 7, 1963 and sold it on March 2, 1967. The return showed a gross sales price of $ 300,000 and a cost basis of $ 585,199.55, with a claimed resulting long-term capital loss of $ 285,199.55. On January 31, 1969, Montgomery entered into an agreement in which he received from Mr. Terry and Mr. Mischer $ 270,500 as full and final payment for the $ 300,000 promissory note. Montgomery also received a refund from a Farm and Home Savings Association insurance obligation in the amount of $ 50,000. Mr. Terry and Mr. Mischer also sold their one-half interest in the Brazilian land for $ 12,500 to Montgomery or MIC, the other half of which had been conveyed to Montgomery or MIC on March 2, 1967. On February 7, 1969 MIC received $ 299,640.35 of the $ 320,500 ($ 270,500 + $ 50,000), the balance going to pay for the Brazilian land, taxes, interest, attorneys' fees and closing costs. MIC deposited the $ 299,640.35 into its corporate bank account. MIC credited an account payable to Montgomery for $ 299,640.35 and Montgomery debited an account receivable from MIC for the same amount on his personal books for the money which had been deposited into MIC's bank account. On his 1969 individual *338 return, Montgomery reported a further loss in regard to Brazos. He reported the sale of a note received March 2, 1967, and sold February 7, 1969. He reported the sales price as $ 299,640.35, the cost basis as $ 350,000 and a short-term loss of $ 50,359.65. LATE FILING OF RETURNS
The Montgomerys failed to file their 1966 and 1967 Federal individual income tax returns on time. The return for 1966 was filed on May 3, 1967. There is no evidence in the record in regard to the reason for the late filing of the 1966 return. On April 6, 1968, Montgomery filed an Application for Extension of Time to File the 1967 return, giving as the reason for his request that he "had considerable illness in his family and has not been able to have a meeting with his bookkeeper and accountant." The application was denied by the District Director on April 10, 1968, stating that [I]t has been determined that the extension is not warranted. Your return should be filed by the regular due date or within 10 days of the date of signature of this notice, if such 10-day period is later than the regular due date. The 10-day period granted shall constitute a valid extension of time for filing returns *339 * * *. Thus, the 1967 return was due on or before April 20, 1968. The Montgomerys filed their 1967 return on May 17, 1968. There is no other evidence in the record in regard to the late filing of this return. A delinquency addition was assessed in the amount of $ 10,200.13, when Montgomery's 1967 tax return was filed on May 17, 1968, and that amount was credited against the total delinquency addition determined in the deficiency notice. DEFICIENCY NOTICES
On December 20, 1974, respondent timely mailed a notice of deficiency to Mr. and Mrs. Montgomery. Respondent increased the Montgomerys' taxable income for dividend income in the amount of $ 301,400 for 1966. Respondent based the increase in taxable income for 1966 on the distribution to Montgomery by MIC of a second mortgage on Stoddard Farm. Respondent determined that the entire distribution in the amount of $ 301,400 was includible in taxable income since MIC had earnings and profits in excess of this amount for its fiscal year ended September 30, 1966. Respondent determined that the $ 140,200 cash payment made for Stoddard Farm was not paid to Montgomery or for his personal benefit and so respondent did not *340 determine a dividend for that amount. Respondent also decreased Montgomery's taxable capital gains income by $ 76,575.52 in 1966. Respondent determined that the taxable capital gains reported on Montgomery's income tax return for the taxable year 1966 from the sale of Stoddard Farm in the amount of $ 173,478.89 and farm equipment in the amount of $ 834.51 actually constituted income to MIC and not to Montgomery. Thus, respondent decreased Montgomery's taxable income by the reported taxable capital gain of $ 76,575.52 from the sale of Stoddard Farm. In the alternative, respondent determined that if the gains from the sale of Stoddard Farm are includible in Montgomery's income for the taxable year 1966, the reported gain is understated in the amount of $ 220,800. In the taxable year 1967 respondent disallowed the claimed long-term capital loss of $ 285,199.55 due to the fact that respondent determined that MIC rather than Montgomery was the creditor/investor in regard to Brazos Engineering Co. and that it was not established that any debt was worthless as of December 31, 1967. In addition, respondent determined that Montgomery received a distribution from MIC in the amount of $ *341 312,500 in the tax year 1967. Included in this distribution was a note receivable from Brazos Engineering Co. in the amount of $ 300,000 and a one-half interest in certain Brazilian land in the amount of $ 12,500. Since respondent determined that MIC's earnings and profits for its fiscal year 1967 amounted to $ 172,933.12, respondent determined that Montgomery had dividend income in the amount of $ 172,933.12 and that the balance of $ 139,566.88 less Montgomery's basis in the stock of MIC of $ 500 constituted long-term capital gain. For the taxable year 1969 respondent determined that Montgomery's short-term capital loss from the sale of the note of Brazos Engineering Co. was $ 29,500, rather than the $ 50,359.65 claimed, treating the cost basis of the note as $ 300,000 and the amount received on its sale as $ 270,500. [11] In addition, in his determination of long-term capital gain, respondent did not reduce the long-term capital gain by the gain from the sale of the Fulton County property in the amount of $ 369,279.50 that Montgomery had reported on his 1969 return. [12] Finally, respondent determined an addition to tax under section 6651(a) for failure to file returns on time *342 for the taxable years 1966 and 1967 in the amounts of $ 7,550.09 and $ 15,656.63, respectively. *343 On December 20, 1974, respondent timely mailed a notice of deficiency to MIC for its fiscal years 1966 through 1969. Respondent first increased MIC's taxable income for the gains on the sales of the Stoddard Farm in 1966 and the Fulton County property in 1969 and determined that the gains are taxable as ordinary income since MIC is in the business of the sale of real estate. Respondent increased MIC's taxable income for its fiscal year 1966 by $ 395,113.40. In his calculation of the amount of sales proceeds from the sale of the Stoddard Farm, respondent included cash of $ 140,200, the mortgage in the amount of $ 220,800 that the purchaser of the Stoddard Farm assumed, and a second mortgage of $ 301,400. For its fiscal year 1969, respondent increased MIC's taxable income by $ 369,279.50 on the sale of the Fulton County property. Due to changes in MIC's taxable income respondent recomputed MIC's net operating loss deductions for its fiscal years 1966, 1967, and 1968 and contributions deductions for fiscal years 1966, 1967, and 1969. For fiscal years 1967 and 1969, respondent also changed certain long-term capital gains on sales of real estate to ordinary income. In addition, *344 respondent disallowed MIC's bad debt deduction of $ 60,790.71 in the taxable year 1969 because neither the existence nor worthlessness of the debt of B. M. Jobe was substantiated. [13]
ULTIMATE FINDINGS OF FACT
1. MIC rather than Montgomery possessed the benefits and burdens of ownership of the Stoddard Farm, and Montgomery merely held bare legal title thereto. Accordingly, MIC is the equitable owner of the Stoddard Farm and is taxable on the gain from the sale of that property. 2. The Stoddard Farm was sold on September 12, 1966, and MIC realized a gain of $ 395,113.40 on that sale. 3. Any of the proceeds from the sale of the Stoddard Farm that were received by Montgomery were received by him as an agent of MIC. None of the proceeds were distributed to Montgomery personally nor did he personally benefit from any of the proceeds. Accordingly, Montgomery did not receive any actual or constructive dividends from MIC *345 in connection with the sale of the Stoddard Farm, at least during any of the years before the Court. 4. MIC rather than Montgomery possessed the benefits and burdens of ownership of the Fulton County property and Montgomery merely held bare legal title thereto. Accordingly, MIC is the equitable owner of the Fulton County property and is taxable on the gain of $ 369,279.50 from the sale of that property in 1969. 5. MIC distributed $ 147,786.84 of the proceeds from the sale of the Fulton County property to Montgomery in 1969. 6. Of the $ 585,199.55 advanced to Brazos Engineering Company, $ 316,978.92 constituted loans to Brazos, $ 246,980.74 constituted an investment in Brazos and $ 21,239.89 constituted miscellaneous expenses related to that investment. 7. The entire amount of $ 585,199.55 was expended by Montgomery as the agent of MIC and acting on behalf of MIC. Accordingly, Montgomery in 1967 received the promissory note and Brazilian land also as an agent of MIC, and hence did not receive an actual or constructive dividend in regard to Brazos. 8. The record does not establish that either the Brazos loan or the Brazos investment became worthless in 1967 or in any *346 other year before the court. OPINION This case presents an essentially factual issue as to who is the taxpayer in regard to the gain on the sales of certain properties, the individual petitioner or his wholly-owned corporation. Respondent says they both are, that the gain is first taxable to the corporation and then taxable to the individual as constructive dividends. The individual petitioner, relying on the fact that he held legal title to the properties but ignoring the facts that for years the properties had been treated on the corporate records as assets of the corporation and that the income and deductions for the properties had been reported on the corporate tax returns, argues that he was the sole owner and that only he is taxable on such gains. The individual petitioner does not suggest that the Court should disregard the corporation as a separate legal entity. Moreover, in view of the business purpose for its incorporation, namely to buy and sell real estate and other properties, and in view of its active conduct of business over the years, there would be no basis for disregarding MIC as a separate legal entity. . *347 The individual petitioner also does not suggest that MIC was acting as his corporate agent, and the facts of record would not support a finding of such corporate agency in any event. . For Federal income tax purposes, gain or loss from the sale or use of property is attributable to the owner of the property. ; . As a general rule a corporation, including one wholly owned by one shareholder, is a taxpayer separate and distinct from its shareholder or shareholders. ; . Thus, when a corporation and shareholder are involved in the ownership of property, a problem exists since two different taxpayers can plausibly be regarded as the owner. This problem is resolved if either the corporation or the shareholder is acting as the agent of the other with regard to the property *348 in question. A corporation must act either through its officers or through its agents. . The president and other officers of the corporation are agents of the corporation. . A general agent is one who is employed to transact generally all of the business of the principal connected with the particular trade or business with which he is intrusted. . The determination of whether one is acting as an agent for a corporation depends upon whether the person purporting to act on the corporation's behalf has actual or apparent authority. The extent of the agent's authority may be inferred from or established by the facts and circumstances attending the transaction in question. . Generally, income received by an agent *349 within the scope of the agency is included in the principal's income for the year it was received by the agent even though not actually received by the principal. ; ; ; . This income is included in the year in which the agent receives it for the principal. ;If the corporation holds legal title to property as an agent, then for tax purposes the principal and not the corporation is the owner. . On the other hand, when the individual holds the legal title to certain property but the corporation claims the benefits and burdens from the property, the corporation is taxable on the sale of this property if the individual is the corporation's agent. With regard to the Stoddard Farm and the Fulton *350 County property, petitioner Montgomery contends that for tax purposes he was the owner of the Stoddard Farm and the Fulton County property, arguing that he purchased the properties with his personal funds and he retained the legal titles in his name. [14] Based on the record as a whole, we have concluded that with regard to the Stoddard Farm and Fulton County property, the individual petitioners, principally Mr. Montgomery, held bare legal title to properties that were beneficially owned by MIC, that Mr. Montgomery acted as the agent of MIC in these transactions, and that the gain is taxable to MIC. During most of the time that Montgomery held legal title *351 to the property, he was the president as well as the agent of MIC. As president of MIC, Montgomery is considered an agent of MIC. Blasinay v. Albert Wenzlick Real Estate Co., supra, 135 S.W.2d at 726. MIC granted Montgomery authority to act as the corporation's agent in all business dealings. At the May 20, 1962 board of directors meeting of MIC, MIC granted Montgomery the power for and on behalf of MIC "to enter into and execute contracts, leases, notes, negotiable instruments of each and every kind, and any other form of agreement with any person or persons, corporation, partnership, or any officers of any City, County, State or Federal Government." Additionally, on January 2, 1967, MIC and Montgomery entered into a formal agency agreement that stated that "Joel A. Montgomery has heretofore been active as an agent and attorney-in-fact for said Company, in which capacity he has been actively engaged in business transactions for and on behalf of the said company * * *" and "the parties hereto desire to have reduced to writing the power, authority and duties of the said agent and attorney-in-fact with references to discharge of said duties with and on behalf of *352 the said Company." The agreement then expressly provided that as MIC's agent Montgomery was authorized to incur indebtedness for and on behalf of MIC in his own name and/or on behalf of MIC, to purchase property in the name of MIC or Montgomery, to disclose or not disclose to third parties the relationship of the agent to MIC, and "[t]hat such properties and assets shall be held by him [Montgomery] as Trustee for the said Company, and his relationship with the said Company shall be that of a Fiduciary with reference to properties and activities engaged in on behalf of said Company." Although Montgomery transferred the bulk of the Stoddard Farm to MIC on January 1, 1962, [15] which was prior to the date the parties signed the formal agency agreement, the agreement clearly stated that it was merely reducing to writing the relationship that had already long been in existence. Thus, Montgomery agreed that he would and had purchased property in either his or the corporation's name for the corporation. Whether the property here in issue that Montgomery purchased in his name was purchased for himself individually or for the corporation depends on all the surrounding facts and circumstances, *353 particularly what was done with regard to the property after it was purchased. With regard to the Stoddard Farm, on January 1, 1962 Montgomery transferred the first tract of that farm to MIC, although he retained legal title to that part of the property in his and his wife's names. *354 In addition, although MIC was listed as the owner of 389.44 acres of the Stoddard Farm, the corporation purportedly transferred those acres to Montgomery on February 8, 1964. However, from January 1, 1962 up to the time of sale in 1966, MIC, not Montgomery, listed all of the property making up the Stoddard Farm as an asset on its Federal corporate tax returns, reported all rental income and expenses from the farm, and claimed deductions for depreciation on the farm. MIC's corporate books are also filled with entries recording expenses of the farm and rental income. The mortgages that Stoddard Farm was subject to were recorded on MIC's corporate books and MIC repaid those loans as to which the Stoddard Farm served as collateral. It was not until the Stoddard Farm was sold in 1966 that Montgomery made any mention of the farm on his own books. Thus, MIC held all incidents of ownership except legal title to the property. However, we have found as a fact that Montgomery held legal title to the Stoddard Farm as an agent of MIC. The same is true with respect to the Fulton County property. The Fulton County property was transferred to MIC at the same time that the bulk of the Stoddard *355 Farm was transferred to the corporation. As with the Stoddard Farm, Montgomery retained legal title to the Fulton County property after the transfer. MIC then listed the property on its Federal corporate tax returns as a corporate asset and consistently took the real estate tax deductions on its returns. In addition, prior to the sale of the property to the City of Atlanta in 1969, MIC paid all of the expenses on the property and MIC's books listed receipts of income, loan proceeds, the payment of expenses and repayment of loans as to which the Fulton County land served as collateral. Montgomery signed an affidavit to the City of Atlanta affirming that he owned the property. However, since he held only bare legal title and had previously acted only on behalf of MIC, he signed this agreement also as the agent of MIC. As specified in the agency agreement between MIC and Montgomery, Montgomery could disclose or not disclose to third parties his relationship as the agent of MIC. [16]MIC's corporate books properly recorded the sale of the Fulton County land in 1969 to the City of Atlanta. Montgomery merely acted as MIC's agent when he sold the property. *356 That Mr. and Mrs. Montgomery were identified in warranty deeds as the owners of real estate that was listed on the books of MIC as corporate assets is nothing new to MIC or Montgomery. [17] Throughout the years that Montgomery held the legal title to the Stoddard Farm and the Fulton County property, Mr. and Mrs. Montgomery were identified in separate warranty deeds as the owners of numerous other parcels of real estate that were also listed on the books of MIC as corporate assets. The sales of these other parcels of real estate were recorded in MIC's corporate books and the gains from such sales were reported on MIC's corporate tax returns. Thus, Mr. and Mrs. Montgomery had often placed their names on warranty deeds and retained legal title to property as agent of MIC. Montgomery acted as the agent of MIC throughout the years in issue, properly reporting any gain from the sale of such real estate on the corporate returns of MIC, except for the two transactions involved in this case. *357 Respondent further contends that even if MIC is the owner of the properties and taxable on the gains from the sales, Montgomery is also taxable for the amounts he received from the sales proceeds as constructive dividends. However, with regard to the proceeds from the Stoddard Farm sale, the record indicates that the proceeds were received by Montgomery as an agent of MIC, were used for the benefit of MIC, were not distributed to the individual taxpayers personally, and that the individual taxpayers did not benefit from the proceeds. Mr. Michael assumed the first mortgage on the farm from MIC in the amount of $ 220,800. MIC deposited the $ 140,200 cash received from Mr. Michael in its corporate bank account, which was used to pay expenses from the sale and pay off obligations owed by MIC. MIC also received at a later date the proceeds from the $ 301,400 second mortgage note. Accordingly, the Montgomerys did not receive any constructive dividends in connection with the sale of the Stoddard Farm, at least during any of the years before the Court. Hence, the Court concludes that only MIC is taxable on the gains from the Stoddard Farm. With regard to the proceeds from the sale *358 of the Fulton County property, MIC deposited $ 147,786.84 in its corporate bank account, used $ 83,333.33 it received to pay off the first mortgage on the property, used $ 44,132.99 for various expenses and distributed $ 147,786.84 to Montgomery. Thus, Montgomery received a constructive dividend from this sale in the amount of $ 147,786.84, which should be taken into account in the Rule 155 proceedings to the extent that it does not result in a deficiency greater than that determined in the deficiency notice. See nn.8, 12, supra.
Montgomery also acted in his capacity as an agent of MIC when investments and loans in the amount of $ 585,199.55 were made to Brazos Engineering Co. These amounts were recorded on MIC's books as either loans or investments from January 1, 1962 through December 31, 1967. Between January 1, 1962 and December 31, 1967, MIC had two separate accounts denominating the money transferred to Brazos, an investment account and loan receivable account. On March 2, 1967 both Montgomery and MIC entered into an agreement with Brazos Engineering Co. to release and discharge each other from any claims, debts or actions. Brazos required the signatures of both MIC *359 and Montgomery since Brazos was not sure whether Montgomery advanced funds on his own behalf or on behalf of MIC. The document between MIC, Montgomery and Brazos stated, however, that according to MIC's books, as of February 15, 1966 MIC had secured and unsecured loans made to Brazos in the amount of $ 490,000. The document did not mention any loans made by Montgomery in his individual capacity. Throughout the time that money was both loaned to and invested in Brazos Engineering Co., this money was listed on MIC's books rather than Montgomery's personal books. In fact, it was not until December 31, 1967 that any mention of Brazos Engineering Co. appeared on Montgomery's personal books at all. On December 31, 1967 Montgomery's personal books list three journal entries totaling $ 585,199.55 with the notations that the entries were to record funds to Brazos that were disbursed by MIC as of October 7, 1963. These entries in Montgomery's personal books are the evidence that Montgomery presents to indicate that he, rather than MIC, loaned money to and invested in Brazos. The December 31, 1967 journal entries in Montgomery's personal accounts seem to be an after-the-fact attempt by *360 Montgomery to recharacterize the transactions and claim that he, rather than MIC, invested in and loaned money to Brazos. However, we have found that MIC, rather than Montgomery, both invested in and loaned money to Brazos Engineering Co. Montgomery was merely acting as an agent when he assigned all of his rights and claims against Brazos Engineering Co. stock to Mr. Terry and Mr. Mischer in exchange for a promissory note of $ 300,000. Of the $ 585,199.55 advanced to Brazos Engineering Co. by MIC, $ 316,978.92 constituted loans. Section 166 allows a taxpayer a deduction against ordinary income if, in connection with the taxpayer's trade or business, a debt becomes worthless in whole or in part during the taxable year. The taxpayer has the burden of proving that the debt became worthless. . In addition, of the $ 585,199.55 advanced to Brazos Engineering Co., $ 246,980.74 constituted an investment in Brazos and $ 21,239.89 constituted miscellaneous expenses related to that investment. Section 165 generally allows a corporate taxpayer a deduction for uncompensated business losses sustained during the year and section 165(g) *361 specifically covers capital losses from worthless securities. The taxpayer has the burden of proving the loss or proving that the stock was worthless in the year in which the deduction was taken. . The record does not establish that the Brazos loan or Brazos stock became worthless in 1967 or in any other year before the Court. MIC has not met its burden of proof and deductions may not be taken in the years before the Court for amounts loaned to or invested in Brazos. The final issue is whether an addition to tax under section 6651(a) for the late filing of the Montgomerys' tax returns for the taxable years 1966 and 1967 is warranted. Section 6651(a) imposes an addition to tax for a taxpayer's failure to file a required return on or before the specified filing date, including extensions. Such addition to tax may be avoided, however, if the taxpayer can show that the failure to file the return was due to reasonable cause and not due to willful neglect. ; . In this case, since there is no evidence *362 in the record in regard to the reason for the late filing of the 1966 return, the Montgomerys have failed to sustain their burden of proof and are liable for the addition to tax under section 6651(a) for the 1966 taxable year. With regard to the 1967 taxable year, although the Montgomerys filed an Application for Extension of Time to File, this application was turned down, and there is no further evidence in the record in regard to the late filing of the return. Thus, they have not met their burden of proof to show that the failure to file the return was due to a reasonable cause and not due to willful neglect. Even if we were to consider the reasons as set forth in the Application for Extension of Time to File as their reasons for the late filing, the individual petitioners still have not met their burden. The vague references to "considerable illness" in the family do not meet this burden. [18] In addition, the vague excuse that Mr. Montgomery was not able to meet with his bookkeeper and accountant is insufficient. A taxpayer is charged with the primary responsibility to see that his returns are timely filed and this responsibility cannot be shifted to an accountant. [19]
*363 To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners orally conceded on the record the issues regarding disallowance of airplane expenses and attorneys' fees. Any other issues raised in the deficiency notices and not discussed in this opinion have either been conceded by petitioners or petitioners have failed to carry their burden of proof in regard thereto.↩
3. There is no explanation in the record as to whether, and if so how, Montgomery avoided the collapsible corporation provisions of the Internal Revenue Code. In any event, there is no contention in this case that MIC was a "collapsible corporation" as defined in section 341(b).↩
4. The corporate minutes in the record are few and consist mostly of unsigned documents. In view of the bad state of the corporate records generally, the Court does not assume that the minutes of a meeting on January 1, 1962 never existed. Moreover, the Court is satisfied that such a meeting took place.↩
5. Montgomery and his wife then executed a deed of trust to Flake L. McHaney as trustee of the beneficiary, ConnecticutGeneral Life Insurance Company, as part of a financing arrangement.↩
6. Since Montgomery's 1966 tax return would not be due until April 15, 1967, and was not in fact filed until a later date, this entry of September 30, 1966 shows that some of these entries in MIC's general journal were not made contemporaneously with the events.↩
7. The parties stipulated into evidence, among other things, some 22 trust deeds, indentures, and general warranty deeds without explanation as to which property or properties or which transactions were involved. Now, as the Court predicted from the bench, the parties disagree as to what these documents purport to show. These documents are hardly self-explanatory; many are virtually or indeed wholly illegible, and both parties seem to expect the Court to accept whatever characterization they choose to give to these documents. On brief petitioners now claim that the sale of the Stoddard Farm occurred in 1965, a year not before the Court. In view of the confusion as to these various documents, petitioners' failure to establish what these documents cover, and the fact that the Montgomerys on their 1966 individual return reported that the sale of the Stoddard Farm occurred on September 12, 1966, the Court finds as a fact that the sale occurred on September 12, 1966, as reported by them.↩
8. On his 1967 return, Montgomery claimed a $ 16,400 long-term capital loss in regard to this $ 301,400 second mortgage note ($ 301,400 - $ 125,000 - $ 160,000 = $ 16,400). Since we have found that Montgomery received this note as the agent of MIC and did not receive a constructive dividend of $ 301,400, as respondent contends, this capital loss deduction should be deleted in the Rule 155 proceedings to the extent that this can be done without increasing the total amount of the deficiency determined in the deficiency notice for 1967. Respondent has not asked for any increased deficiency for any of the years before the Court.↩
9. A final settlement with the Massachusetts investors was made on September 14, 1967. Both MIC and Montgomery signed this settlement agreement.↩
10. Montgomery also retained an interest in a lawsuit, W. J. Swacker judgment, but no further mention of this suit was made and respondent did not include it in any notice of deficiency.↩
11. The individual petitioners apparently do not challenge that treatment and respondent has not suggested any further adjustment. However, in view of the Court's ultimate conclusion in regard to Brazos, an adjustment should be made in the Rule 155 proceedings provided it does not result in any increased deficiency for that year. See nn.8, supra, and 12, infra.↩
12. On brief respondent's counsel erroneously argued that neither the individual nor corporate taxpayer had reported that gain. Since respondent says this gain was taxable to MIC, respondent should now agree that the amount should be removed from Montgomery's 1969 income. However, as the Court's findings show, Montgomery received from MIC $ 147,786.84 of the proceeds from the sale of the Fulton County property, and should be taxable on that amount as a constructive dividend. In the Rule 155 proceedings, the reported capital gain should be removed and this amount of $ 147,786.84 ordinary income substituted to the extent that it does not result in a deficiency greater than that determined in the deficiency notice. See n.8, supra.↩
13. This item was challenged in MIC's petition to the Court, but no evidence has been presented in regard thereto. This bad debt item has either been conceded by the corporate taxpayer or MIC has failed to sustain its burden of proof on the issue.↩
14. We agree that Montgomery held the legal titles in his name; however, we have concluded he was acting as MIC's agent in doing so. As to the source of the funds used for the purchase prices of the various tracts of land, petitioners have failed to sustain their burden of proof. We do not accept Montgomery's conclusory testimony that the corporation had no funds, and that all of the money was his money. Montgomery simply disregards the separate legal existence of his corporation and tries to treat it as his own deep pocket.↩
15. At trial Montgomery claimed that the January 1, 1962 transfer of $ 1,074,798.56 worth of Montgomery's assets to MIC was a bookkeeping error that the accountant mistakenly made. Montgomery claims that he was both unaware of this transfer for the seven years involved here and that the accountant acted on his own when he listed the transferred property on MIC's books and MIC's corporate tax returns. Montgomery, however, signed most of those corporate returns. At the time of the trial the accountant was dead. The Court found Montgomery's claim of error by the accountant inherently incredible. When questioned about various items, Montgomery could only respond that the information was "in the books," the same books he tried to discredit. The Court did not believe his explanation of an error by the accountant, particularly since he himself placed so much reliance on what was shown in the books.↩
16. Petitioners argue that MIC was not authorized to do business in Georgia. Assuming that is the fact, that would explain the purpose of the provision in the agency agreement for an undisclosed principal. In any event, we would also find that MIC had equitable or beneficial ownership of the Fulton County property under Georgia law. See ; .↩
17. With regard to the first 1,039 acres of the Stoddard Farm that were purchased, both Mr. and Mrs. Montgomery's names appear on the legal title. Mrs. Montgomery was a homemaker and apart from signing some deeds and trust indentures does not appear to have been otherwise involved in any of these transactions.↩
18. In , this Court held that if a taxpayer presents evidence to show that he or she is so ill that he or she is incapable of filing income tax returns, the illness constitutes reasonable cause. ↩
19. ; .↩